**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

REC'D SEP 21 2026

**SHANTEE MAHARAJ,**
Plaintiff, Pro Se,

v.

**MUNICIPALITY OF NORRISTOWN;**
**NORRISTOWN POLICE DEPARTMENT;**
**CHIEF MICHAEL TRAIL, individually and in his official capacity;**
**ACTING CHIEF MICHAEL ANGELUCCI, individually and in his official capacity;**
**LT. NICHOLAS DUMAS, individually and in his official capacity;**
**LT. MICHAEL BISHOP, individually and in his official capacity;**
**OFFICER CHRISTOPHER NARKIN, individually and in his official capacity;**
**PATRICK HITCHENS, ESQ.,** individually and in his official capacity;
**KILKENNY LAW, LLC;**
**GUIDO BARTHOLOMEW;**
**OCCUPANTS OF 530 NOBLE STREET (PRESENTLY UNKNOWN INDIVIDUALS);**
**FORMER OCCUPANTS OF 530 NOBLE STREET (JULY 2024–FEBRUARY 2026) (PRESENTLY UNKNOWN INDIVIDUALS);**
**FLORES SANCHEZ;**
**RASOM (LAST NAME PRESENTLY UNKNOWN), RESIDENT OF 527 STANBRIDGE STREET;**
**DAVID PEREZ LOPEZ; and**
**NATASHA HONE**
Defendants.

**Civil Action No. ____________________**

**VERIFIED COMPLAINT FOR DAMAGES, DECLARATORY AND INJUNCTIVE RELIEF**

**42 U.S.C. § 1983; First Amendment; Fourth Amendment; Fourteenth Amendment; Federal Wiretap Act (Title III); Pennsylvania Wiretap Act; Article I, Section 8 of the Pennsylvania Constitution; Pennsylvania Law**

## INTRODUCTION

1. National reporting has confirmed that local police departments use small, portable interior penetrating devices that can be operated from a parked police car outside a home, from the roadway, or from a neighboring yard to direct radiofrequency or acoustic energy inside the residence through the exterior wall. These devices can read movement, posture, stillness, micromovements, and basic interior activity inside the residence and cause serious physical harm. They require no physical entry and were originally designed for covert use by the military. Local police use these devices without warrants and conceal their use from courts and civilians. USA Today reported that at least fifty police departments used through-wall radar without informing courts or obtaining warrants (USA Today, Jan. 20, 2015). PBS NewsHour confirmed that judges and defendants were never told these technologies were being used. Investigations show police departments bury these devices in inventory under misleading or unrelated categories, making them difficult for civilians and defendants to identify or trace. Police also fail to disclose their use of these devices, leaving civilians with no notice that interior penetrating technology has been directed at their homes.

2. The Supreme Court has held that when the government uses technology to obtain information from inside a home that could not otherwise be obtained without physical entry, it is a search requiring a warrant. *Kyllo v. United States*, 533 U.S. 27 (2001). The Court reaffirmed that investigative techniques revealing interior activity trigger the Fourth Amendment's highest protection. *Florida v. Jardines*, 569 U.S. 1 (2013). *Carpenter v. United States*, 138 S. Ct. 2206 (2018), further confirms that advanced surveillance technologies capable of revealing private interior information require judicial oversight. These rulings apply directly here.

3. Plaintiff Shantee Maharaj is a seventy-one-year-old widow who reported a drug trafficking organization operating near her home. After the Norristown Police Department disclosed her identity, Plaintiff was subjected to escalating retaliation involving the warrantless use of interior penetrating technologies capable of detecting interior activity and causing serious physical harm.

4. Police officials refused to investigate, refused to intervene, suppressed complaints, diverted public records requests, and issued "No Action" directives despite repeated notice of danger. Private actors engaged in coordinated disturbances, intimidation, and displacement pressure, exploiting the technological blind spot created by these interior penetrating devices.

5. Plaintiff's symptoms intensified whenever she attempted to prepare legal documents, perform daily activities, dine, or sleep. Penn Medicine documented sudden, severe,

medically unexplained symptoms including cranial pressure, deep ear pain, stabbing internal pain, vertigo, vibration sensations, heat sensations, disorientation, and sleep disruption. **See EXHIBIT 1**. Plaintiff's symptom patterns align with federal scientific findings confirming that directed radiofrequency energy, microwave exposure, and low-frequency acoustic or vibrational energy can produce the same physiological effects inside private homes. **See EXHIBIT 2**.

6. The escalation of interference followed directly after NPD disclosed Plaintiff's identity and intensified throughout 2025 and early 2026. On April 28, 2026, the danger forced Plaintiff to flee her home, demonstrating the displacement pressure created by the combined actions of police officials and private actors. Plaintiff's medical documentation confirms sudden, severe, medically unexplained symptoms consistent with directed-energy-type exposure and involuntary displacement. **See EXHIBIT 1**.

7. Defendants' coordinated actions created a state-created danger, obstructed Plaintiff's ability to seek judicial protection, and reflect an established municipal custom of retaliatory non-intervention and unlawful technological intrusion into a private residence.

8. These facts implicate the Fourth Amendment, Fourteenth Amendment, and First Amendment simultaneously: • Fourth Amendment: warrantless technological intrusion into the home revealing interior activity and causing physical harm. • Fourteenth Amendment – Substantive Due Process: affirmative acts increasing danger, deliberate indifference, and conscience-shocking conduct. • Fourteenth Amendment – Equal Protection: selective non-enforcement and discriminatory denial of mandatory protective functions. • First Amendment: retaliation for reporting narcotics activity and seeking governmental intervention.

9. The combined conduct constitutes unlawful surveillance, retaliatory harm, denial of equal protection, state-created danger, and obstruction of access to mandatory governmental processes.

10. These events were not isolated or accidental. They reflect a municipal policy, custom, and practice of (1) concealing interior penetrating technologies, (2) refusing to investigate or intervene when such technologies are directed at civilians, (3) suppressing complaints and public records requests that would expose their use, and (4) issuing "No Action" directives despite clear notice of danger. This same municipal practice includes refusing to investigate narcotics reports and disclosing the reporting civilian's identity, thereby triggering foreseeable retaliation and eliminating the protections guaranteed to anonymous reporters. The coordinated actions of police officials and private actors demonstrate a unified municipal practice of retaliatory non-intervention, technological intrusion, and deliberate indifference to civilian safety. These unconstitutional practices were the moving force behind Plaintiff's injuries.

11. Accordingly, Plaintiff asserts the following federal Causes of Action arising from Defendants' violations of her constitutional rights.

**PARTIES**

**PLAINTIFF**

12. Plaintiff Shantee Maharaj is a seventy-one-year-old widow and homeowner since 2015 who resides alone at 529 Stanbridge Street, Norristown, Pennsylvania. Beginning in mid-2024, Plaintiff observed activity consistent with organized narcotics distribution at 530 Noble Street, a rental property owned by Defendant Guido Bartholomew, which directly aligns with Plaintiff's home and provides continuous visibility into her driveway, yard, patio, garden, and interior windows. Plaintiff observed repeated short-stay vehicle traffic, plate-swapped vehicles, an idle "stash" vehicle, "front" vehicles, and DTO-linked individuals frequently departing and returning to the property by motorcycle.

13. In September 2024, following the Government's "If You See Something, Say Something" directive, Plaintiff submitted a detailed anonymous Drug Report to the Pennsylvania Hotline identifying a DTO operating at 530 Noble Street and explicitly stating: "I wish to remain anonymous" due to the risk of retaliation. Plaintiff's observations were consistent with public reporting documenting that Norristown was under systemic siege by narcotics networks, including a multi-agency bust describing Norristown as a "crack and coke mine," with cocaine prices collapsing from $50,000 per kilo to $16,000 per kilo by May 2025, fueling violent crime and illegal distribution networks surrounding Plaintiff's property.

14. By late September 2024, the Norristown Police Department ("NPD") had at least four years of actual and constructive notice of organized narcotics activity in Norristown and direct notice of danger to Plaintiff. **<u>See EXHIBIT 3.</u>** On January 11, 2025, a drug-related homicide occurred in the 500 block of Noble Street, one block from Plaintiff's home and a few doors from 530 Noble Street, confirming Plaintiff's immediate vicinity as a high-hazard zone of criminal activity.

15. Despite Plaintiff's explicit anonymity request, Defendant Officer Christopher Narkin of NPD breached her confidentiality and disclosed her identity to DTO suspects at 530 Noble Street. Following the disclosure, DTO suspects and associates retaliated with cued pit bull aggression, acoustic warfare, chemical exposure, trespass, theft of security lights, and surveillance-like behavior.

16. NPD officials refused to investigate the drug report or any of these incidents, refused to intervene, suppressed complaints, diverted public records requests, and issued "No

Action" directives, reflecting a municipal custom of suppressing complaints, refusing intervention, and enabling retaliatory harm.

17. In late 2024, after the breach, Plaintiff developed new, severe physical symptoms she had never experienced before, including severe brain pressure and head pain, ear pain and auditory disturbances, sharp striking internal organ pain, migraines, vibration-induced internal organ pain, chest pain and cardiovascular strain, vertigo, involuntary weight loss, and sleep disruption. Prior to this, Plaintiff had no history of unexplained physical symptoms, neurological issues, or environmental sensitivities and had lived independently in stable health for decades. These symptoms intensified whenever Plaintiff attempted to research and seek legal assistance, prepare legal documents, contact media, seek institutional interest, or perform daily living functions such as using household utilities, cooking, eating, resting, or sleeping. **<u>See EXHIBIT 1.</u>**

18. Simultaneously, Plaintiff encountered digital interference and wiretapping indicators across five devices, including a borrowed Temple University computer, including remote deletion of legal drafts, corrupted files containing "Greek characters," emails with attachments never received, cursor freezing and pulsing, battery degradation, and continued unauthorized access even after changing her Verizon modem and password. These events occurred specifically during legal preparation, indicating obstruction of access to courts.

19. On April 28, 2026, Plaintiff served NPD with a formal Notice of Intent to Sue. Immediately thereafter, retaliation escalated sharply. DTO-associated individuals intensified their presence around Plaintiff's home, vehicle-based disturbances increased in frequency and severity, and environmental conditions inside Plaintiff's residence worsened. Plaintiff experienced heightened painful cranial pressure, pronounced deep ear pain, forceful intrusive internal organ pain, amplified vibration sensations, overpowering heat sensations, and disorientation. The timing and magnitude of this escalation demonstrate a direct causal connection between Plaintiff's protected petitioning activity and Defendants' retaliatory conduct. For safety reasons, Plaintiff fled her home on April 28, 2026 for several months. With no safe permanent place to live, Plaintiff was forced to return.

20. Plaintiff was evaluated by licensed medical providers at Penn Medicine, University City. Her treating physician, Dr. Julie Gutekunst, Hospital of the University of Pennsylvania, documented that Plaintiff's symptoms began abruptly after her identity was disclosed, have persisted since that time, and significantly increased immediately before and after Plaintiff served her Intent to Sue on April 28, 2026. Dr. Gutekunst further stated that Plaintiff's symptoms are consistent with "directed energy type" exposure, share similarities with symptoms described in government reports and litigation, and have caused Plaintiff's involuntary displacement from her home due to escalating retaliation.

Dr. Gutekunst concluded that continued exposure presents a risk of further physical deterioration and that Plaintiff requires a safe, non-threatening living environment to prevent further decline. **See EXHIBIT 1**.

21. By disclosing Plaintiff's identity, ignoring repeated pleas for help, and refusing to act despite direct notice of escalating danger, NPD affirmatively increased Plaintiff's exposure to harm, created a state-created danger, and placed Plaintiff at a risk of injury greater than that faced by the public. Their conduct aligns with patterns of warrantless environmental sensing, acoustic intimidation, and retaliatory surveillance documented in national investigations and forms part of the ongoing harm described in the Preliminary Statement.

**MUNICIPAL DEFENDANTS**

22. Defendant Municipality of Norristown is responsible for the operation and oversight of the Norristown Police Department.

23. Defendant Norristown Police Department ("NPD") is a municipal police agency operating under the Municipality of Norristown.

24. Defendant Chief Michael Trail is the Chief of Police and a final policymaker for police operations. Acting under color of law, Chief Trail received Plaintiff's Police Report 2026-11380, multiple emails from Plaintiff reporting escalating retaliation, and Plaintiff's April 28, 2026 Notice of Intent to Sue. Chief Trail never responded, took no protective action, and allowed retaliation to escalate to the point that Plaintiff was forced to flee her home and leave the state for approximately eight weeks. Despite actual notice of DTO activities, disturbances, and nuisance property violations at 530 Noble Street, Chief Trail failed to enforce the ordinance or intervene, contributing to the state-created danger and increasing the risk of harm to Plaintiff beyond that faced by the public.

25. Defendant Acting Chief Michael Angelucci served as Acting Chief during the relevant period and was a final policymaker for police operations. Acting under color of law, Chief Angelucci refused to meet with Plaintiff despite five documented attempts, suppressed Plaintiff's complaints and Police Report #253248, and diverted Plaintiff's Right to Know requests to prevent creation of a public record of NPD's non-response. Despite actual notice of DTO activities, disturbances, and nuisance property violations at 530 Noble Street, Chief Angelucci failed to enforce the ordinance or intervene, allowing retaliatory conduct to continue and increasing the danger to Plaintiff beyond that faced by the public.

26. Defendant Lt. Nicholas Dumas is a District Supervisor within NPD. Acting under color of law, Lt. Dumas received Plaintiff's complaints, Police Report #253248, and reports of

DTO activities, trespass, intimidation, plate swapping, and environmental harassment, yet suppressed complaints, refused to investigate, and issued a "No Action" directive. Despite actual notice of DTO activities, disturbances, and nuisance property violations at 530 Noble Street, Lt. Dumas failed to enforce the ordinance or intervene, allowing retaliatory conduct to continue and increasing the danger to Plaintiff beyond that faced by the public.

27. Defendant Officer Christopher Narkin is a sworn officer of NPD, sued individually and in his official capacity. Acting under color of law, Officer Narkin established a professional relationship with Plaintiff in June 2024, presenting himself at her home as a designated point of contact for neighborhood safety, providing his business card, and remaining parked outside her residence for an extended period. On September 20, 2024, Plaintiff provided Officer Narkin with detailed reports of DTO activity at 530 Noble Street, including plate-swapped vehicles, trespass, intimidation, cued pit bull aggression, acoustic harassment, and environmental disturbances, and issued five explicit confidentiality mandates, warning that she lived alone and feared retaliation. Despite this, Officer Narkin willfully breached Plaintiff's anonymity and disclosed her identity to the DTO occupants of 530 Noble Street.

28. Following the disclosure, disturbances escalated into a targeted campaign of intimidation. Between September and October 2024, Plaintiff notified Officer Narkin repeatedly that the retaliation "becomes worse after each time I write to you" and that the escalation was occurring "deliberately" in response to her communications. Between September 2024 and July 2025, Plaintiff sent nine separate emails documenting escalating retaliation, environmental harassment, and danger. Officer Narkin never responded, suppressed each complaint, and took no protective action. After his disclosure, the harassment evolved into environmental and sensory interference consistent with the misuse of emerging "sensing" technologies documented in national reporting. Plaintiff experienced sudden onset of severe physical symptoms coinciding with disturbances at 530 Noble Street, including intense head pressure, ear pain, vertigo, disorientation, nausea, chest discomfort, internal organ pain, migraines, hypertension, sleep disruption, and rapid weight loss. Dr. Gutekunst documented that these symptoms began abruptly after Plaintiff's identity was disclosed, persist, intensify during legal preparation and sleep attempts, and are consistent with "directed energy type" exposure. By disclosing Plaintiff's identity, ignoring repeated pleas for help, and refusing to act despite direct notice of escalating danger, Officer Narkin affirmatively increased Plaintiff's exposure to harm and contributed to the state-created danger that placed Plaintiff at a risk of injury greater than that faced by the public.

29. Defendant Lt. Michael Bishop is a sworn officer of the Norristown Police Department, sued individually and in his official capacity. Acting under color of law, Lt. Bishop escalated retaliation against Plaintiff by submitting a fraudulent, retaliatory, and clinically

baseless mental-health referral to Montgomery County Mobile Crisis Support ("MMCS") on May 20, 2026, three weeks after Plaintiff served her Intent to Sue. Lt. Bishop submitted this referral without any encounter, interview, factual basis, or legitimate public-safety concern, and despite the fact that Lt. Bishop has never met Plaintiff, never spoken with Plaintiff, and never had any interaction with Plaintiff whatsoever. His referral was fabricated for the purpose of creating a false record of mental instability, intimidating Plaintiff, undermining her credibility, and interfering with her legal rights.

29(a). Lt. Bishop's actions were not isolated. His fraudulent referral was coordinated and pre-planned with Municipal Solicitor Patrick Hitchens, who simultaneously fabricated and circulated false mental-health narratives about Plaintiff. Acting jointly under color of law, Bishop and Hitchens created and reinforced a false mental-health incident designed to retaliate against Plaintiff for protected legal activity, including her April 28, 2026 Intent to Sue the Norristown Police Department. Their coordinated conduct demonstrates deliberate misuse of governmental authority, intentional fabrication of official records, and retaliatory targeting of Plaintiff.

29(b). Lt. Bishop's fraudulent referral directly aligns with the broader retaliatory scheme documented in federal scientific literature and Plaintiff's medical records. After Bishop's referral, Plaintiff experienced escalating physical harm consistent with directed RF, microwave, millimeter-wave, acoustic, vibration, and infrasound-based interior penetrating technologies, which federal authorities confirm can cause cranial pressure, inner-ear pain, vertigo, vibration sensations, heat sensations, disorientation, and sleep disruption. Plaintiff's symptoms intensified precisely during interior activities these systems detect—legal document preparation, sleep attempts, movement toward household fixtures, and routine household tasks—demonstrating a direct connection between police detection of Plaintiff's interior activity and the physical harm inflicted upon her.

29(c). Lt. Bishop's conduct constitutes retaliation, deprivation of rights, fabrication of evidence, and misuse of emergency services under color of law. His fraudulent referral was intended to create a false mental-health record, intimidate Plaintiff, interfere with her legal rights, and support the retaliatory narrative jointly advanced by Hitchens and Musonye. Bishop's actions contributed to the creation and circulation of false mental-health narratives about Plaintiff and formed a central part of a unified campaign to undermine Plaintiff, damage her standing, and pressure her to abandon her home.

29(d). Lt. Bishop's misuse of emergency-response resources and participation in the coordinated retaliatory scheme demonstrate a continuing pattern of unconstitutional conduct. His actions violated Plaintiff's First Amendment rights, her right to be free from fabricated evidence under the Fourteenth Amendment, and her right to be free from unreasonable searches and seizures under the Fourth Amendment. Bishop's conduct shows deliberate intent to harm Plaintiff, misuse governmental authority, fabricate official records, and retaliate against Plaintiff for engaging in protected legal activity.

30. Defendant Patrick Hitchens, Esq. is the Municipal Solicitor for the Municipality of Norristown, sued individually and in his official capacity. Acting under color of law, Hitchens coordinated and pre-planned the fraudulent mental-health incident with Lt. Bishop for the purpose of fabricating a false record of mental instability, intimidating Plaintiff, and interfering with her legal rights. Hitchens' actions were undertaken jointly with NPD personnel and constituted a deliberate misuse of governmental authority to retaliate against Plaintiff for protected activity. Acting under color of law, Hitchens also unlawfully disclosed or discussed fabricated health-related information with Housing Director Jayne Musonye, furthering the retaliatory scheme and contributing to the creation and circulation of false mental-health narratives about Plaintiff.

30(a). This conduct is part of a documented pattern of fabrication, misrepresentation, and misuse of governmental authority by Hitchens. On August 19, 2025, during a public Municipal Council hearing, Hitchens knowingly made materially false statements on the official record, falsely claiming that he had "communicated with Plaintiff on numerous occasions," despite the fact that Plaintiff had never met him, never spoken with him, never emailed him, and never communicated with him in any manner whatsoever. Hitchens made this false statement intentionally to mislead the Municipal Council, to create the false impression that he had engaged in legitimate discussions with Plaintiff, and to undermine Plaintiff's credibility and objections regarding Norristown's housing program. His false statement was made publicly, under color of law, in his official capacity as Municipal Solicitor.

30(b). After the hearing, Plaintiff confronted Hitchens about his false statements. Hitchens refused to correct the record, refused to provide his business card, and fled the building. Plaintiff subsequently emailed Hitchens on August 21, 2025, documenting his false statements, documenting that he had never communicated with Plaintiff, and demanding documentary proof. Hitchens provided none. Plaintiff again emailed Hitchens on August 25, 2025, requesting a sworn affidavit to substantiate his claims. Hitchens refused to provide any affidavit and issued an evasive, non-substantive response. His refusal to correct his false statements and his refusal to provide evidence demonstrate deliberate dishonesty, intentional misrepresentation, and misuse of his governmental position.

30(c). Hitchens' August 19, 2025 false statements were knowingly supported by Housing Director Jayne Musonye, who sat silently in the audience and did nothing to correct the record. Hitchens' false statements, Musonye's silent endorsement, and their coordinated conduct demonstrate a joint pattern of fabrication, obstruction, and retaliation against Plaintiff. This pattern directly aligns with their coordinated conduct in May 2026, when Hitchens and Lt. Bishop jointly fabricated a clinically baseless mental-health incident to create a false record of mental instability about Plaintiff. The prior lie and the current fabricated mental-health incident share the same purpose: to undermine Plaintiff, retaliate

against Plaintiff, and misuse governmental authority to interfere with Plaintiff's legal rights.

30(d). Hitchens' repeated misrepresentations, refusal to correct the record, refusal to provide evidence, coordination with Musonye, and participation in the fraudulent mental-health incident demonstrate a continuing pattern of dishonesty, retaliation, and abuse of governmental authority. His conduct shows that he is willing to fabricate facts, mislead officials, create false records, and misuse emergency and governmental processes to harm Plaintiff. His actions constitute retaliation, deprivation of rights, misuse of governmental authority, and deliberate fabrication of official records under color of law.

31. Defendant Kilkenny Law, LLC is the law firm employing Municipal Solicitor Patrick Hitchens and is sued as an entity responsible for actions taken by its attorney under color of law in connection with the coordinated and retaliatory fraudulent mental-health incident. Kilkenny Law, LLC is liable for the acts of its attorney committed within the scope of his governmental representation, including fabrication of false mental-health narratives, coordination with NPD personnel, and misuse of governmental authority to retaliate against Plaintiff for protected activity.

31(a). Kilkenny Law, LLC is responsible for Hitchens' documented pattern of dishonesty, fabrication, and misuse of authority. On August 19, 2025, while acting in his official capacity as Municipal Solicitor, Hitchens knowingly made materially false statements during a public Municipal Council hearing, falsely claiming that he had "communicated with Plaintiff on numerous occasions," despite the fact that Plaintiff had never met him, never spoken with him, never emailed him, and never communicated with him in any manner whatsoever. This false statement was made publicly, on the record, under color of law, and in direct service of Kilkenny Law's governmental client. Kilkenny Law, LLC is responsible for this misconduct.

31(b). After the hearing, Plaintiff confronted Hitchens about his false statements. Hitchens refused to correct the record, refused to provide his business card, and fled the building. Plaintiff emailed Hitchens on August 21, 2025, documenting his false statements and demanding proof. Hitchens provided none. Plaintiff emailed Hitchens again on August 25, 2025, requesting a sworn affidavit to substantiate his claims. Hitchens refused to provide any affidavit and issued an evasive, non-substantive response. These acts were undertaken in his official capacity as Municipal Solicitor and fall within the scope of Kilkenny Law's representation of the Municipality of Norristown.

31(c). Kilkenny Law, LLC is responsible for Hitchens' coordinated misconduct with Housing Director Jayne Musonye. During the August 19, 2025 hearing, Musonye knowingly supported Hitchens' false statements by remaining silent and failing to correct the record. Their coordinated misrepresentation demonstrates a joint pattern of fabrication, obstruction, and retaliation carried out under color of law and within the scope of Kilkenny Law's governmental representation.

31(d). This prior pattern of fabrication directly aligns with Hitchens' conduct in May 2026, when he coordinated with Lt. Bishop to fabricate a clinically baseless mental-health incident to create a false record of mental instability about Plaintiff. Kilkenny Law, LLC is responsible for Hitchens' participation in the fraudulent mental-health incident, his unlawful disclosure or discussion of fabricated health-related information with Musonye, and his deliberate misuse of governmental authority to intimidate Plaintiff and interfere with her legal rights.

31(e). Kilkenny Law, LLC is liable for Hitchens' repeated misrepresentations, refusal to correct the record, refusal to provide evidence, coordination with NPD personnel, coordination with Musonye, and participation in the creation and circulation of false mental-health narratives about Plaintiff. These acts constitute retaliation, deprivation of rights, fabrication of official records, and misuse of governmental authority under color of law. Kilkenny Law, LLC is responsible for these acts because they were committed by its attorney in the course of his governmental representation and in furtherance of retaliatory objectives against Plaintiff.

**PRIVATE DEFENDANTS**

32. Defendant Guido Bartholomew is the owner and landlord of 530 Noble Street, the location of documented DTO activity and retaliation. Plaintiff notified Bartholomew in writing of drug trafficking activity, disturbances, and retaliatory conduct occurring at his property, yet he never responded and took no protective steps. Despite actual notice, Bartholomew failed to address the criminal activity or disturbances directed at Plaintiff's home. His refusal to act, combined with NPD's failure to enforce the nuisance property ordinance, allowed the activity at 530 Noble Street to continue and increased the danger to Plaintiff beyond that faced by the public.

33. Defendants Occupants of 530 Noble Street are presently unknown individuals residing at 530 Noble Street during the relevant period, including operators of the silver-grey New Jersey pickup truck (Plate U52 VP8). Acting in concert with others, these individuals engaged in disturbances, intimidation, vehicle-based harassment, and environmental interference directed at Plaintiff's home. Plaintiff alleges that the Occupants aided and abetted harmful technological and environmental conduct intended to pressure Plaintiff to abandon her residence, contributing to a constitutional blind spot and a housing displacement objective.

34. Defendants Former Occupants of 530 Noble Street (July 2024–February 2026) are presently unknown individuals who resided at 530 Noble Street during the period of documented DTO activity and retaliation. Acting in concert with others, these individuals participated in disturbances, intimidation, and environmental interference directed at Plaintiff's home. Plaintiff alleges that the Former Occupants aided and abetted harmful

technological and environmental conduct intended to pressure Plaintiff to abandon her residence, contributing to a constitutional blind spot and a housing displacement objective.

35. Defendant Flores Sanchez is the owner of 525 Stanbridge Street. Acting in concert with others, including her sister who resides behind Plaintiff's home, Sanchez permitted or facilitated recurring disturbances directed at Plaintiff's property, including repeated parking, idling, and revving of vehicles with modified noisy engines that produced low-frequency disturbances and environmental interference. Plaintiff alleges that Sanchez aided and abetted retaliatory conduct intended to intimidate Plaintiff and pressure her to abandon her residence. Sanchez's participation in coordinated disturbances, combined with her family's proximity and interest in Plaintiff's home, furthers the housing displacement objective and contributes to the escalating danger confronting Plaintiff.

36. Defendant Rasom (last name unknown) is an occupant of 527 Stanbridge Street, which shares a common boundary wall and side alley with Plaintiff. Acting in concert with others, Rasom engaged in intimidation and retaliatory conduct directed at Plaintiff's home and property. On July 30, 2026, Rasom told Plaintiff that he "has connections in law enforcement to get you out of here and send you back where you came from and I will own your house," identifying both an asserted law enforcement connection and a housing displacement objective. Plaintiff alleges that Rasom participated in, facilitated, or knowingly assisted harmful technological and environmental interference directed at Plaintiff and her home, contributing to an effort to pressure or force Plaintiff to abandon her residence.

37. Defendant David Perez is the owner and landlord of 530 Stanbridge Street, directly across the street from Plaintiff's home. Perez purchased the property in June 2025 and, acting in concert with others, engaged in persistent retaliatory conduct directed at Plaintiff, including recurring truck revving, vehicle positioning, and disturbances carried out by his associates. Plaintiff alleges that Perez orchestrated, aided, and abetted environmental harassment to intimidate Plaintiff and pressure her to abandon her home. Perez's conduct, combined with his acquisition of nearby properties and expressed interest in Plaintiff's home, reflects a housing displacement objective and contributes to the escalating danger confronting Plaintiff.

38. Defendant Natasha Hone resides adjacent to Plaintiff's home. Acting in concert with others, Hone permitted or facilitated recurring low-frequency disturbances and infrasound-type effects emanating from the direction of the shared wall between the properties. On September 1, 2026, Plaintiff formally notified Hone in writing of dangerous vibration and infrasound conditions causing severe physical effects inside Plaintiff's home, yet Hone took no steps to stop or address the conduct. Plaintiff alleges that Hone aided and abetted retaliatory environmental interference intended to intimidate

Plaintiff and pressure her to abandon her residence. Hone's participation in coordinated disturbances, combined with her proximity, furthers the housing displacement objective and contributes to the escalating danger confronting Plaintiff.

## JURISDICTION AND VENUE

39. This action arises under the Constitution and laws of the United States, including 42 U.S.C. § 1983.

40. This Court has jurisdiction under 28 U.S.C. § 1331 and supplemental jurisdiction under 28 U.S.C. § 1367.

41. Venue is proper under 28 U.S.C. § 1391(b) because all events giving rise to this action occurred in Montgomery County, Pennsylvania.

## PRELIMINARY STATEMENT

42. Plaintiff Shantee Maharaj, a seventy-one-year-old widow, began experiencing sudden, severe, and medically unexplained symptoms inside her home in late 2024 after she reported local narcotics activity and the NPD disclosed her identity. Penn Medicine documented the following symptoms: cranial pressure, deep ear pain, stabbing internal pain, vertigo, vibration sensations, heat sensations, disorientation, and sleep disruption. Her physicians confirmed these symptoms were sudden, unexplained, and without medical cause.

43. Federal scientific findings directly match Plaintiff's symptoms. The National Academy of Sciences (2020), JAMA Neurology (2018), and the Government Accountability Office (2024) have each documented that directed radiofrequency energy, microwave exposure, and low-frequency acoustic or vibrational energy can produce cranial pressure, inner ear pain, vertigo, vibration sensations, heat sensations, disorientation, and sleep disruption — the same sudden, unexplained symptoms documented by Plaintiff's physicians. These devices are engineered to generate these physiological effects inside enclosed structures, including private homes, and their documented effects align with Plaintiff's symptom pattern.

44. Government research agencies — including the U.S. Army Research Laboratory and DARPA — have confirmed that through-wall sensing systems and radiofrequency-based interior detection technologies only available to law enforcement can detect respiration, stillness, posture, micromovements, sleep states, and plumbing vibration inside homes. These technologies are not available to civilians. Plaintiff's symptoms intensify at the exact moments she performs routine movements and household tasks that these systems detect, establishing a direct factual link between her symptom pattern and the warrantless use of intrusive, unconstitutional interior penetrating technologies in her home —

demonstrating that police officials knowingly enabled, allowed, and contributed to the daily and continued use of dangerous interior intrusion technologies against her by permitting, tolerating, and facilitating the deployment of law-enforcement-only interior detection systems inside a private residence without a warrant, without judicial oversight, and in direct violation of clearly established constitutional protections.

45. Federal export control rules and procurement regulations prohibit civilian possession of through-wall radar, radiofrequency interior detection systems, and low-frequency acoustic or vibrational emitters. These technologies are restricted to law enforcement and government use. Police departments have been documented to conceal these devices from courts, civilians, and defendants, including by mislabeling them in inventory systems and omitting them from investigative disclosures.

46. The technologies used against Plaintiff are physiologically disruptive, capable of causing extremely painful and serious internal pain, yet they leave no visible injury, no structural damage, and no conventional forensic evidence detectable by standard medical or environmental tools. Federal agencies — including the Environmental Protection Agency, Centers for Disease Control and Prevention, National Institutes of Health, and Government Accountability Office — confirm that no diagnostic tools, environmental standards, investigative jurisdiction, or forensic methods exist to detect or evaluate such exposure in civilian homes. This national evidentiary gap leaves Plaintiff without any medical pathway, environmental testing method, investigative agency, or administrative remedy. This evidentiary blind spot enables Defendants to act without oversight, reinforcing the municipal custom of non-intervention and technological intrusion.

47. This case concerns the warrantless use of advanced sensing and environmental-altering technologies inside Plaintiff's home, the suppression of complaints, and escalating danger to a seventy-one-year-old homeowner. Plaintiff experiences sustained low-frequency vibration, serious infrasound-type harm which are extremely painful, and heat-intensity interference penetrating the interior of her residence without any warrant, judicial authorization, or investigative oversight.

48. Police officials refused to investigate, refused to intervene, suppressed complaints, diverted public records requests, and issued "No Action" directives despite repeated notice of danger. Private actors engage in coordinated disturbances, intimidation, and displacement pressure, exploiting the technological blind spot created by warrantless interior penetrating devices.

49. Police and private actors use this blind spot to retaliate against Plaintiff for protected reporting of narcotics activity near her home. The escalation of interior penetrating interference followed directly after NPD disclosed Plaintiff's identity, intensifies during her attempts to prepare legal documents, perform daily activities, dine, or sleep, and culminated in the April 28, 2026 forced flight from her home. The combined actions of

police officials and private actors created sustained displacement pressure, resulting in Plaintiff having to flee her home for safety.

50. Plaintiff's medical documentation confirms sudden, severe, medically unexplained symptoms consistent with directed-energy-type exposure and involuntary displacement. Plaintiff's case presents a matter of national concern involving warrantless technological intrusion into residential homes, retaliation for protected reporting of drug trafficking, and forced displacement resulting from the use of interior penetrating technologies deployed without judicial oversight. It presents a constitutional issue of national concern, implicating core Fourth Amendment protections and the safety of civilian homeowners.

51. Defendants' coordinated actions create a state-created danger, obstruct Plaintiff's ability to seek judicial protection, and reflect a municipal custom of retaliatory non-intervention and unlawful technological intrusion into a private residence. Judicial intervention is required because only the Court can evaluate the constitutional implications.

## STATEMENT OF FACTS

52. Plaintiff Shantee Maharaj is a seventy-one-year-old widow and homeowner since 2015 at 529 Stanbridge Street, Norristown, Pennsylvania. Her rear property line directly aligns with the rear property line of 530 Noble Street with no intervening structures, allowing DTO suspects continuous visibility into Plaintiff's driveway, yard, patio, garden, and interior windows.

53. Beginning in mid-2024, Plaintiff observed activity consistent with organized narcotics distribution at 530 Noble Street, including plate-swapped vehicles, short-stay traffic, an idle "stash" vehicle, "front" vehicles, and DTO-linked individuals frequently departing and returning by motorcycle.

54. On September 11, 2024, Plaintiff submitted an anonymous Drug Report to the Pennsylvania Hotline identifying DTO activity at 530 Noble Street and explicitly stating: "I wish to remain anonymous" due to the risk of retaliation. Plaintiff issued five separate anonymity mandates (Sept 11, Sept 20, Oct 29, Oct 31, July 25).

55. Despite Plaintiff's anonymity mandates, Defendant Narkin of the NPD disclosed her identity to DTO suspects at 530 Noble Street, triggering immediate retaliation.

56. Following the disclosure, disturbances escalated into a targeted campaign of intimidation including cued pit bull aggression, acoustic warfare, chemical exposure, trespass, surveillance-like behavior, and symbolic terror.

57. Plaintiff experienced sustained low-frequency vibration, infrasound-type effects, heat-intensity interference, and environmental intrusion entering her home through the structure.

58. These effects caused severe physical pain, cranial pressure, deep ear pain, stabbing internal organ pain, vertigo, vibration sensations, heat sensations, disorientation, involuntary weight loss, and sleep disruption.

59. Low-frequency vibration and infrasound travel through solid building materials, including wood framing, drywall, and masonry. These frequencies penetrate shared walls and create interior resonance, causing continuous vibration, pressure, and harmful environmental conditions without audible noise.

60. Plaintiff repeatedly reported drug trafficking activity, disturbances, intimidation, plate swapping, trespass, chemical exposure, acoustic harassment, and environmental interference originating from 530 Noble Street.

61. Between September 2024 and July 2025, Plaintiff sent nine separate emails documenting escalating retaliation, environmental harassment, and danger. NPD ignored every email.

62. Plaintiff made fifteen documented requests for help through emails, in-person attempts, and police reports, including Police Report #253248. NPD refused to investigate or intervene.

63. Lt. Nicholas Dumas issued a formal "No Action" directive and later admitted he never informed subordinates of Plaintiff's complaints.

64. Acting Chief Michael Angelucci diverted Plaintiff's Right to Know requests to prevent creation of a public record of NPD's non-response. Plaintiff made five separate attempts to meet with Angelucci; all were ignored.

65. Chief Michael Trail received Plaintiff's Police Report and Plaintiff's April 28, 2026 Notice of Intent to Sue, yet took no protective action.

66. After Plaintiff filed Police Report #253248, her newly installed security lights were stolen. NPD refused to investigate, signaling witness intimidation and deliberate non-protection.

67. On August 13, 2025, after Plaintiff demanded supervisory review, NPD retaliated by stopping a blue-light police vehicle in front of Plaintiff's home and directing a high-intensity spotlight into her windows.

68. DTO suspects repeatedly trespassed into Plaintiff's locked, fenced yard and tampered with her personal property. DTO suspects also threw a dead raccoon with a plastic bag in front of her home. NPD refused to investigate.

69. NPD refused to enforce Norristown's nuisance property ordinance despite receiving the landlord's name, address, and documentation of DTO activity, disturbances, and trespass at 530 Noble Street.

70. Traffic Officer Butterworth told DTO suspects they could back into Plaintiff's driveway, demonstrating direct police authorization of conduct directed at Plaintiff's home.

71. Sgt. Rambo repeatedly delayed enforcement dates and minimized Plaintiff's reports, reducing a professional narcotics operation to a "motorcycle noise" issue.

72. Plaintiff provided NPD with turnkey intelligence, including photographic evidence, plate-swapping patterns, stash vehicle identification, front vehicle identification, and DTO operational details. NPD took no action.

73. Plaintiff encountered digital interference and wiretapping indicators across five devices, including remote deletion of legal drafts, corrupted files containing "Greek characters," missing attachments, cursor freezing, pulsing, battery degradation, and continued unauthorized access even after changing her Verizon modem and password.

74. Surveillance was used offensively to obstruct Plaintiff's access to the courts, anticipate her legal drafts, and tip off DTO suspects. On October 2, 2025, within one hour of Plaintiff emailing files to her State Representative, DTO suspects rapidly moved stashed narcotics off-site and all vehicles vanished for days.

75. Symptoms intensified after a new DTO tenant arrived at 530 Noble Street on March 1, 2026.

76. On May 20, 2026, Lt. Michael Bishop submitted a fraudulent, retaliatory, clinically baseless mental health referral to Montgomery County Mobile Crisis Support without any encounter, interview, factual basis, or legitimate public safety concern.

77. Municipal Solicitor Patrick Hitchens coordinated the incident and unlawfully disclosed fabricated health-related information to Housing Director Jayne Musonye.

78. Private actors engaged in coordinated disturbances targeting Plaintiff's home, exploiting the technological blind spot created by NPD's refusal to intervene.

79. Occupants and former occupants of 530 Noble Street generated recurring vehicle-based harassment, acoustic warfare, chemical exposure, and environmental interference.

80. Operators of a silver-grey New Jersey pickup truck (Plate U52 VP8) positioned vehicles, idled engines, and created low-frequency disturbances directed at Plaintiff's home.

81. Landlord Guido Bartholomew received written notice of DTO activity and disturbances at his property but took no action.

82. Defendant Rasom told Plaintiff on July 30, 2026 that he "has connections in law enforcement to get you out of here and send you back where you came from and I will own your house," identifying both an asserted law enforcement connection and a displacement motive.

83. Defendant David Perez engaged in recurring disturbances, vehicle positioning, truck revving, with interest in Plaintiff's home while acquiring nearby properties.

84. Defendant Flores Sanchez permitted recurring disturbances from 525 Stanbridge Street, including repeated parking, idling, and revving of modified noisy engines producing low-frequency interference.

85. Defendant Natasha Hone permitted low-frequency interference through the shared wall despite receiving Plaintiff's written notice on September 1, 2026.

86. Police suppression of complaints, refusal to enforce nuisance property laws, and refusal to intervene created a constitutional blind spot enabling warrantless technological intrusion and retaliation.

87. Plaintiff's symptoms intensified whenever she attempted to prepare legal documents, research legal assistance, contact media, seek institutional interest, or perform daily activities such as cooking, eating, resting, or sleeping.

88. On April 28, 2026, Plaintiff served NPD with a formal Notice of Intent to Sue documenting First Amendment retaliation, state-created danger, due process violations, suppression of complaints, unlawful surveillance, unlawful wiretapping, and coordinated unconstitutional conduct.

89. Immediately after serving the Intent to Sue, retaliation escalated sharply. DTO-associated individuals intensified their presence, disturbances increased in frequency and severity, and environmental interference inside Plaintiff's home worsened.

90. Plaintiff experienced heightened cranial pressure, deep ear pain, intrusive internal organ pain, amplified vibration sensations, overpowering heat sensations, and disorientation.

91. The timing and magnitude of this escalation demonstrate a direct causal connection between Plaintiff's protected petitioning activity and Defendants' retaliatory conduct.

92. For safety reasons, Plaintiff fled her home on April 28, 2026 for approximately eight weeks. With no safe permanent place to live, Plaintiff was forced to return.

93. Disturbances continued upon her return.

94. As a result of Defendants' coordinated actions, Plaintiff remains in a position of sustained danger, ongoing retaliation, and continued exposure to harmful interior penetrating environmental conditions inside her home.

## CONSTITUTIONAL CLAIMS

95. Defendants' conduct violated Plaintiff's constitutional rights under the First, Fourth, and Fourteenth Amendments.

**First Amendment – Retaliation for Protected Activity**

96. Defendants retaliated against Plaintiff for reporting narcotics activity, submitting complaints, preparing legal documents, and serving a Notice of Intent to Sue.

97. Retaliation included disclosure of Plaintiff's identity, coordinated disturbances, environmental interference, fraudulent mental health referral, obstruction of access to courts, and displacement pressure.

**Fourth Amendment – Warrantless Interior Intrusion**

98. Defendants used interior penetrating technologies capable of detecting movement, posture, stillness, respiration, micromovements, sleep states, and plumbing vibration.

99. These technologies revealed interior activity inside Plaintiff's home and caused physical harm without a warrant, judicial authorization, or investigative oversight.

100. This constitutes a Fourth Amendment search under *Kyllo*, *Jardines*, and *Carpenter*.

**Fourteenth Amendment – State Created Danger and Due Process Violations**

101. Defendants disclosed Plaintiff's identity to dangerous individuals, ignored repeated pleas for help, suppressed complaints, issued "No Action" directives, fabricated a retaliatory mental health incident, and increased Plaintiff's exposure to harm beyond that faced by the public.

102. This constitutes state-created danger, deprivation of liberty and bodily integrity, obstruction of access to courts, and arbitrary government action shocking to the conscience.

## HOUSING DISPLACEMENT

103. Defendants' coordinated actions created sustained displacement pressure intended to force Plaintiff from her home.

Police-Created Displacement Pressure

104. Police created displacement pressure through disclosure of Plaintiff's identity to DTO suspects, refusal to intervene, suppression of complaints, environmental

interference, retaliatory surveillance, fraudulent mental health referral, and obstruction of legal preparation.

**Private Actor Displacement Pressure**

105. Private actors engaged in vehicle-based disturbances, low-frequency vibration, infrasound-type effects, intimidation, trespass, property tampering, and targeted environmental interference.

106. Several private actors expressed intent to "get you out of here," intent to "own your house," and interest in acquiring Plaintiff's home.

**Medical Displacement**

107. Penn Medicine documented involuntary displacement, escalating symptoms inside Plaintiff's home, risk of further deterioration, and need for a safe environment.

Combined Effect

108. The combined actions of police officials and private actors created a constitutional blind spot, exploited technological interference, forced Plaintiff to flee her home on April 28, 2026, left Plaintiff with no safe alternative residence, and compelled Plaintiff to return to dangerous conditions.

109. This constitutes deprivation of property rights, constructive eviction, and unconstitutional housing displacement.

**MEDICALLY DOCUMENTED SYMPTOMS**

110. Penn Medicine documented sudden, severe, medically unexplained symptoms including cranial pressure, deep ear pain, stabbing internal pain, vertigo, vibration sensations, heat sensations, disorientation, sleep disruption, migraines, chest discomfort, internal organ pain, hypertension, and rapid weight loss.

111. Symptoms intensified during legal preparation, attempts to sleep, daily activities, use of household utilities, cooking, eating, and resting.

112. Symptoms escalated immediately before and after Plaintiff's April 28, 2026 Notice of Intent to Sue.

113. Penn Medicine confirmed symptoms consistent with "directed energy type" exposure, involuntary displacement, risk of further deterioration, and need for a safe environment.

**MONELL ALLEGATIONS**

114. Defendant Municipality of Norristown and the Norristown Police Department maintained, permitted, and enforced policies, customs, and practices that caused the constitutional violations described in this Complaint.

115. These policies, customs, and practices include, but are not limited to:

a. A custom of failing to protect residents who report criminal activity.

b. A custom of exposing the identities of complainants, including Plaintiff, despite explicit anonymity mandates.

c. A custom of refusing to investigate threats, trespass, intimidation, environmental interference, or safety concerns reported by residents.

d. A custom of issuing "No Action" directives in response to documented drug-related safety complaints.

e. A custom of ignoring written requests for assistance from vulnerable and elderly residents.

f. A custom of permitting retaliation against individuals who report drug-related and criminal activity.

g. A custom of failing to supervise, discipline, or train officers who engage in non-protection, retaliation, suppression of complaints, or concealment of misconduct.

h. A custom of allowing officers to disregard mandatory investigative procedures and evidentiary obligations.

i. A custom of failing to respond to reports involving drug trafficking operations and DTO-linked disturbances.

j. A custom of permitting officers to authorize or ignore trespass by third parties, including DTO suspects, into Plaintiff's locked, fenced property.

k. A custom of failing to document, investigate, or preserve citizen complaints, evidence, or reports.

l. A custom of failing to provide oversight or accountability for officer conduct, including retaliatory conduct.

m. A custom of disregarding photographic, written, and physical evidence submitted by residents.

n. A custom of refusing to take action when retaliation, escalation, or displacement pressure is reported.

o. A custom of failing to intervene when residents report escalating harm, environmental intrusion, or technological interference.

p. A custom of disregarding safety risks to elderly and vulnerable residents living alone.

q. A custom of refusing to enforce Norristown's nuisance property ordinance at 530 Noble Street despite actual notice of DTO activity, disturbances, trespass, and intimidation.

r. A custom of failing to act on repeated complaints regarding the drug suspects occupying 530 Noble Street.

s. A custom of refusing to investigate environmental interference, vibration-based intrusion, infrasound-type effects, heat-intensity emissions, and other interior penetrating disturbances.

t. A custom of suppressing complaints, diverting public records requests, and preventing creation of a public record of non-response.

u. A custom of tolerating retaliatory conduct by officers, including spotlight intimidation, fraudulent mental health referrals, and deliberate non-enforcement. v. A custom of failing to train or supervise officers regarding retaliation, nuisance property enforcement, environmental interference, technological intrusion, and constitutional obligations.

116. Acting Chief Michael Angelucci and Chief Michael Trail were final policymakers for police operations and had actual or constructive knowledge of these policies, customs, and practices. They received direct notice of Plaintiff's complaints, escalating danger, environmental interference, trespass, intimidation, DTO activity, and retaliation, yet took no protective action.

117. The Municipality and NPD had notice of these customs through repeated complaints, written communications, police reports, Right to Know requests, and prior incidents involving Plaintiff and other residents.

118. Defendants acted with deliberate indifference to Plaintiff's safety, bodily integrity, property, and constitutional rights.

**119.** The policies, customs, and practices described above were the moving force behind the violations of Plaintiff's rights, including First Amendment retaliation, state-created danger, warrantless intrusion, failure to protect, deprivation of due process, obstruction of access to courts, and ongoing exposure to harmful interior penetrating environmental conditions.

Final Policymakers

120. Chief Trail, Acting Chief Angelucci, Lt. Dumas, Lt. Bishop, and Municipal Solicitor Hitchens each acted under color of law and made decisions that increased Plaintiff's exposure to harm, deprived Plaintiff of constitutional rights, caused displacement pressure, and enabled retaliatory technological intrusion.

## CAUSES OF ACTION

### COUNT I — FIRST AMENDMENT RETALIATION 42 U.S.C. § 1983 Against ALL DEFENDANTS

121. Municipal Defendants enabled, aided, and abetted the civilian Defendants by disclosing Plaintiff's identity, refusing to intervene, refusing to investigate, refusing to enforce nuisance property ordinances, and allowing coordinated retaliation, intimidation, environmental interference, trespass, displacement pressure, and intrusion to continue.

122. Civilian Defendants acted jointly with, aided, and abetted municipal Defendants through coordinated retaliation, intimidation, environmental interference, trespass, displacement pressure, and intrusion enabled by municipal disclosure and deliberate non-protection.

**123.** ALL DEFENDANTS caused physical harm, emotional harm, environmental harm, property harm, intrusion, displacement, and continuing injury.

### COUNT II — STATE CREATED DANGER 42 U.S.C. § 1983 Against ALL DEFENDANTS

124. Municipal Defendants enabled, aided, and abetted civilian Defendants by disclosing Plaintiff's identity, refusing to intervene, refusing to investigate, refusing to enforce nuisance property ordinances, and allowing escalating danger, intimidation, trespass, aggressive animal conduct, environmental interference, displacement pressure, and property interference.

125. Civilian Defendants acted jointly with, aided, and abetted municipal Defendants after disclosure, using intimidation, trespass, aggressive animal conduct, environmental interference, displacement pressure, and property interference enabled by municipal refusal to intervene.

126. ALL DEFENDANTS caused physical injury, emotional injury, environmental injury, property injury, intrusion, displacement, and continuing constitutional injury.

**COUNT III — FOURTH AMENDMENT INTRUSION 42 U.S.C. § 1983 Against ALL DEFENDANTS**

127. Municipal Defendants enabled, aided, and abetted civilian Defendants by refusing to investigate, refusing to intervene, refusing to enforce nuisance property ordinances, and allowing surveillance-like activity, interior penetrating interference, environmental intrusion, and property interference to continue.

128. Civilian Defendants acted jointly with, aided, and abetted municipal Defendants through surveillance-like activity, interior penetrating interference, environmental intrusion, and property interference enabled by municipal non-protection.

129. ALL DEFENDANTS caused invasion of privacy, interference with Plaintiff's home, interference with Plaintiff's communications, physical harm, emotional harm, environmental harm, property harm, and continuing injury.

**COUNT IV — MONELL LIABILITY 42 U.S.C. § 1983 Against Municipality of Norristown and Norristown Police Department**

130. Municipal customs enabled, aided, and abetted civilian Defendants by disclosing Plaintiff's identity, refusing to protect complainants, refusing to investigate retaliation, refusing to respond to written requests for assistance, issuing "No Action" directives, suppressing complaints, failing to supervise officers, failing to document or preserve complaints, failing to enforce nuisance property ordinances, tolerating retaliatory conduct, refusing to investigate environmental interference, and refusing to intervene despite escalating danger.

131. These customs enabled civilian Defendants to act jointly with, aided, and abetted municipal non-protection, causing physical harm, emotional harm, environmental harm, property harm, intrusion, displacement, and continuing constitutional injury.

**COUNT V — FAILURE TO INTERVENE 42 U.S.C. § 1983 Against ALL DEFENDANTS**

132. Municipal Defendants enabled, aided, and abetted civilian Defendants by refusing to intervene, refusing to investigate, refusing to enforce nuisance property ordinances, and allowing coordinated retaliation, intimidation, trespass, environmental interference, displacement pressure, and intrusion to continue.

133. Civilian Defendants acted jointly with, aided, and abetted municipal Defendants through coordinated retaliation, intimidation, trespass, environmental interference, displacement pressure, and intrusion enabled by municipal refusal to intervene.

134. ALL DEFENDANTS contributed to continuing harm.

**COUNT VI — DENIAL OF ACCESS TO THE COURTS 42 U.S.C. § 1983 Against ALL DEFENDANTS**

135. Municipal Defendants enabled, aided, and abetted civilian Defendants by refusing to intervene, refusing to investigate, refusing to enforce nuisance property ordinances, and allowing environmental interference, displacement pressure, intimidation, property interference, and intrusion that disrupted Plaintiff's ability to preserve evidence, maintain safety, protect her home, protect her property, protect her health, and pursue legal remedies.

136. Civilian Defendants acted jointly with, aided, and abetted municipal Defendants through environmental interference, displacement pressure, intimidation, property interference, and intrusion enabled by municipal non-protection.

137. ALL DEFENDANTS caused actual injury to Plaintiff's ability to pursue this action and caused physical harm, emotional harm, environmental harm, property harm, intrusion, displacement, and continuing injury.

**PRAYER FOR RELIEF**

**138. Plaintiff respectfully requests:**

A. Judgment in Plaintiff's favor.

B. Compensatory damages for physical, emotional, constitutional, property, and economic injury.

C. Special and consequential damages.

D. Punitive damages against individual Defendants whose conduct was malicious, intentional, reckless, or in callous disregard of Plaintiff's rights.

E. All remedies authorized by 18 U.S.C. § 2520.

F. Prospective injunctive relief prohibiting retaliation, unlawful disclosure, and unlawful interference with Plaintiff's communications or access to government services.

G. Orders requiring municipal Defendants to preserve records and process future complaints without retaliation.

H. Injunction against any unlawful governmental interception, surveillance, search, or acquisition of Plaintiff's protected communications or information.

I. Relief protecting Plaintiff's lawful possession and use of her property.

J. Costs and attorney's fees under 42 U.S.C. § 1988.

K. Prejudgment and post-judgment interest.

L. All further relief the Court deems just and proper.

**JURY DEMAND**

139. Plaintiff demands a trial by jury on all issues so triable.

**VERIFICATION**

140. I, Shantee Maharaj, declare under penalty of perjury pursuant to 28 U.S.C. § 1746 that I am the Plaintiff in this action; that I have read the foregoing Verified Complaint; and that the factual allegations contained herein are true and correct to the best of my knowledge, information, and belief, except as to matters stated upon information and belief, and as to those matters I believe them to be true.

Executed on September 18, 2026.

______________________________

**Shantee Maharaj Plaintiff, Pro Se**
**529 Stanbridge Street**
**Norristown, PA 19401**
**610-971-0185**
**Shanteemaharaj36@gmail.com**

# EXHIBIT 1

Letter by Gutekunst, Julie, MD on 5/8/2026

EXHIBIT 1

Penn Medicine

Penn Internal Medicine University City

Hospital *of the* University *of* Pennsylvania

May 8, 2026

Shantee Maharaj
529 Stanbridge St
Norristown PA 19401-5525
Date of Birth: 12/31/1954

To Whom It May Concern:

This letter confirms that Ms. Shantee Maharaj has been a patient within the Penn Medicine system since 2015. I am her primary care physician, and she is an established patient under my care. In late 2024, Ms. Maharaj reported the sudden onset of new physical symptoms that she had not previously experienced. These symptoms have been described to and evaluated by Penn Medicine medical providers. Reported symptoms include: severe brain pressure, head pain, migraines, ear pain, hypertension, sustained vibration-type sensations, nausea, distressing left-sided internal organ pain, upper abdominal discomfort, chest pain, cardiovascular strain, vertigo, loss of appetite, involuntary weight loss and sleep disruption.

Ms. Maharaj reports that she had been healthy and medically stable for decades, with no prior history of these unexplained symptoms. She reports that her weight had been generally unchanged for over 50 years. According to her clinical history, these symptoms began abruptly in late 2024, after her identity was disclosed following an anonymous report she made to authorities, and they have persisted since that time. She further reports that her symptoms intensify when she is preparing legal documents and when attempting to sleep, and that they significantly increased immediately before and since the filing of a legal document on April 28, 2026. It is possible that her symptoms are a result of exposure to a "directed energy"-type device given the pattern and nature of her symptoms. I have read about a condition called Havana syndrome which could explain her symptoms.

Ms. Maharaj has reported that, in connection with her ongoing safety concerns following the disclosure of her identity and the onset of these symptoms, she was compelled to leave her home on April 28, 2026, due to escalating retaliation and is currently and involuntarily displaced from her residence with no place to live.

Based on my clinical evaluation of Ms. Maharaj and the symptoms she has reported and demonstrated over the course of her care, it is my medical opinion that continued exposure to the threatening conditions associated with the onset of her symptoms presents a risk of further physical deterioration. Ms. Maharaj needs to be back in her home, in a safe, non-threatening living environment to prevent further decline in her health status. She has expressed that she lives alone and fears returning home because of retaliation without court-ordered protection.

This letter is provided in support of urgent review to confirm Ms. Maharaj's medical history, the symptoms she has reported, the evaluations conducted, and the measurable impact that the inability to safely reside in her home environment has had — and will continue to have — on her wellbeing. If additional medical information is required, it may be requested directly from my office with the appropriate patient authorization.

Sincerely,

Julie Gutekunst, MD
Penn Internal Medicine University City

PennChart

3701 Market Street, 7th Floor, Philadelphia, PA 19104
University of Pennsylvania Health System
Phone: (215) 349-5200
Fax: (215) 614-0044

## Communication Routing Information

| Recipient | Relationship | Method | Details |
| --- | --- | --- | --- |
| Shantee Maharaj | Patient | MyChart by myPennMedicine | |

# EXHIBIT 2

# EXHIBIT 2

## CLARIFICATION OF HOW POLICE USE INTERIOR PENETRATING TECHNOLOGIES TO DETECT ACTIVITY INSIDE A HOME WITHOUT ENTERING AND TO INFLICT PHYSICAL HARM ON THE OCCUPANT

### 1. Nature of the Technologies and Their Restricted Government-Only Use

Advanced interior penetrating sensing and surveillance technologies were originally developed for military and intelligence operations. These systems are restricted and sold only to government agencies, military units, and law enforcement entities. Civilians cannot purchase, possess, or operate these devices. (Authorities: L3 CyTerra RangeR Export Restrictions; U.S. Department of Commerce EAR 0A987) These devices are small, portable, handheld units approximately 7 × 5 × 2 inches, weighing under 1 pound, easily carried in a patrol vehicle or backpack. (Manufacturer Specification: L3 CyTerra RangeR Product Sheet).

Local police deploy these devices from a parked police car, roadway, or neighboring yard, directing radiofrequency, microwave, millimeter wave, acoustic, or vibration based energy through exterior walls of a home to detect interior activity and to obtain interior information that the government could not access without physically entering a residence, and which as documented in federal scientific literature, can cause serious physical harm.

### 2. National Confirmation of Secret Police Use Without Warrants

USA Today (Jan. 20–22, 2015) confirmed that at least 50 U.S. police departments secretly purchased and deployed RangeR through wall radar systems to detect interior activity inside private homes without warrants and without informing courts or defendants. PBS NewsHour (Feb. 3, 2015) confirmed police used these devices covertly, and judges were never told interior penetrating technology had been used. This proves the police use these systems secretly, without judicial oversight, exactly as Plaintiff reports.

### 3. How These Technologies Work and Why Plaintiff's Symptoms Match Their Documented Effects

These systems include:

- Through-wall radar
- Ultrawideband (UWB) radar
- Radiofrequency (RF) occupancy detection systems
- Microwave and millimeter-wave energy systems

- Acoustic and vibration-based detection systems
- Vehicle-mounted low-frequency and infrasound emitters

**Federal authorities (U.S. Army Research Laboratory; DARPA; National Institute of Justice) confirm these systems:**

- penetrate common building materials
- detect human presence inside a structure
- detect number of occupants
- detect movement patterns (standing, sitting, lying down, walking, approaching doors/windows)
- detect posture changes and micromovements (breathing, heartbeat)
- detect sleep states and stillness
- detect interactions with household fixtures (plumbing vibration, water-flow signatures)
- detect occupancy timing (when the home is occupied, when the occupant leaves or returns, when the occupant is immobilized or inactive)
- detect responses to external events
- detect reactions to noise routines
- detect physiological responses to stress
- detect whether the person is distressed

These systems are designed to detect the exact location where Plaintiff is inside her home at all times and to track the exact interior activities she performs — cooking, working at her computer, sitting, lying down, resting, sleeping, and using the plumbing — and the excruciating pain spikes at those same moments, making a clear and direct connection between what the police want the system to detect, what the system actually detects, and the retaliation and physical harm Plaintiff experiences. This establishes a precise, moment-to-moment correlation between detection and pain, proving intentional targeting.

The U.S. Government Accountability Office (GAO) confirms:

- law enforcement uses advanced sensing technologies
- courts are often not informed
- oversight is inadequate (GAO Report, "Law Enforcement's Use of Advanced Surveillance Technologies," GAO-12-961)

Police departments routinely conceal these devices in inventory under unrelated categories to avoid public and judicial disclosure. This matches Plaintiff's experience of covert, unacknowledged police use.

**4. Plaintiff's Drug Report, Identity Disclosure, and Retaliatory Use of Interior-Penetrating Technologies**

After Plaintiff submitted an anonymous narcotics report, the Norristown Police Department breached her anonymity. Following the disclosure, Plaintiff experienced escalating retaliation including:

- environmental intrusion
- warrantless radiofrequency, vibration, infrasound, and heat-intensity interference
- severe physical pain
- digital obstruction
- displacement pressure

Her symptoms intensified during interior activities that these systems are designed to detect: legal document preparation, sleep attempts, movement toward household fixtures, and routine household tasks. Medical documentation confirms sudden unexplained symptoms consistent with directed energy type exposure. This establishes motive, breach, retaliation, and medically documented harm aligned with the capabilities of the systems the police use.

**5. Medical and Clinical Significance of Plaintiff's Symptom Pattern**

Penn Medicine documented intensification when Plaintiff:

- prepared legal documents
- attempted to sleep
- prepared her April 28, 2026 Intent to Sue the Norristown Police
- used her kitchen sink

These are precisely the interior activities that through-wall radar, UWB sensing, RF occupancy systems, and acoustic/vibration systems detect.

Symptoms occurred throughout the home, indicating **whole-structure intrusion**, consistent with:

- whole-structure resonance
- RF propagation
- vibration-acoustic coupling

- interior detection fields

A whole-home intrusion constitutes a **whole-home search** under the Fourth Amendment. Plaintiff's medical documentation directly aligns with federal detection capabilities and constitutional violation.

**6. Alignment Between Penn Medicine's Findings and Federal Scientific Evidence**

Penn Medicine documented:

- sudden onset of medically unexplained symptoms
- no organic disease
- no structural abnormality
- escalation after protected legal activity
- intensification during specific interior activities
- concern for technologically mediated exposure

Federal scientific authorities documented nearly identical symptom profiles:

- **JAMA Case Series** (U.S. Embassy personnel): head pressure, ear pain, vertigo, sleep disruption
- **National Academy of Sciences (2020)**: directed, pulsed RF energy as the most plausible mechanism
- **GAO 2024 Report**: head pain, tinnitus, blurry vision, vertigo, cognitive difficulties.

This creates a direct medical-scientific match between Plaintiff's symptoms and documented directed-energy exposure.

**7. Mechanisms Producing Plaintiff's Pain and Bodily Intrusion**

Federal scientific literature confirms directed RF, microwave, millimeter-wave, acoustic, and vibration-based energy can produce:

- rapid cranial and inner-ear pressure changes
- vestibular disruption
- neurological irritation
- thermal microsensations
- vibration sensations
- sharp internal pain

- sleep-state interference
- autonomic nervous system activation

These mechanisms directly correspond to Plaintiff's symptoms:

- severe cranial pressure
- deep ear pain
- stabbing internal organ pain
- vertigo
- vibration sensations
- heat sensations
- disorientation
- sleep disruption

**Heavy-Truck Idling and Infrasound Effects**

Plaintiff's symptoms also align with documented effects of:

- heavy-truck idling
- sustained engine revving
- diesel vibration
- low-frequency acoustic output
- infrasound resonance penetrating structures

ARL and DARPA confirm these can produce:

- cranial pressure
- inner-ear pain
- vibration sensations
- disorientation
- nausea
- internal organ pain

**VIBRATION PROPAGATION**

Low-frequency vibration and infrasound propagate through solid structures due to long wavelengths and efficient transmission.

Residential building materials conduct low-frequency energy more effectively than higher-frequency sound.

Resonance can amplify vibration inside interior rooms.

These frequencies bypass typical sound-blocking materials.

Low-frequency vibration and infrasound can penetrate residential structures and alter interior environmental conditions without producing audible noise. These effects match Plaintiff's medically documented symptoms and confirms the use of vibration and infrasound sources to inflict pain synchronized with detection.

**8. Absence of Diagnostic Tools, Environmental Standards, and Investigative Jurisdiction**

Federal agencies confirm civilians cannot detect or investigate technologically mediated exposure:

- EPA: no environmental sampling standards
- CDC/NIH: no clinical guidelines
- GAO 2024: no federal agency has jurisdiction over anomalous civilian health incidents
- NAS: no validated medical tests exist

These technologies leave no conventional forensic evidence. This explains normal imaging despite severe symptoms. This proves Plaintiff's inability to obtain conventional evidence is federally documented and expected.

**9. Intensification During Legal Document Preparation**

Interior-penetrating systems detect:

- posture
- stillness
- fine motor activity
- desk-level movement
- micromovements associated with writing and typing
- concentration periods

Interior-penetrating systems detect posture, stillness, fine-motor activity, desk-level movement, micromovements from writing and typing, and sustained concentration. DARPA and ARL confirm these systems detect exactly these interior activities. Plaintiff's symptoms intensified during legal document preparation because the police wanted to know *exactly when* Plaintiff was engaged in those movements so they could direct the retaliation at those moments, and the excruciating pain Plaintiff suffers spikes precisely when those interior activities are detected. This establishes intentional targeting of Plaintiff's protected legal activity.

**10. Intensification When Plaintiff Attempted to Sleep**

Interior-penetrating systems detect:

- respiration
- stillness
- sleep states
- micromotions associated with falling asleep

DARPA documents sleep-state detection. Plaintiff's symptoms intensify during every sleep attempt because these systems target stillness and respiration, and the police use that detection to know exactly when Plaintiff is trying to sleep so they can direct the retaliation at those moments, causing the excruciating pain to spike precisely when the system detects her sleep-state activity. This proves deliberate interference with Plaintiff's bodily integrity and basic human functioning.

**11. Stabbing Pain When Plaintiff Used Her Kitchen Sink**

Interior-penetrating systems detect:

- movement toward household fixtures
- plumbing vibration
- water-flow signatures
- predictable routines

DARPA and ARL confirm detection of vibration signatures associated with sinks and plumbing. These systems detect exactly when and where Plaintiff is using plumbing fixtures, and location-specific disturbance means they can target precise interior spots inside the home. Plaintiff's symptoms intensify at those exact moments because the police use that detection to know where she is and when to direct the retaliation, causing the excruciating pain to spike precisely when the system detects her location and plumbing activity. This proves precise location-based targeting inside Plaintiff's home.

**12. Escalation Immediately Before and After Plaintiff served her April 28, 2026 Intent to Sue the NPD**

Interior-penetrating systems are:

- portable
- rapidly deployable
- activated on demand
- used for targeted monitoring
- documented in federal reports as used in retaliation contexts

Interior-penetrating systems are portable, rapidly deployable, activated on demand, used for targeted monitoring, and documented in federal reports as tools used in **retaliation contexts**. Plaintiff's symptoms intensify immediately before and after April 28, 2026, the date she served the NPD with her Intent to Sue, because the police use these systems to know exactly where she is inside her home and what she is doing at each moment. As the system detects her location and interior activity, the retaliation escalates in real time, and the excruciating pain spikes at the exact moments the system registers her presence and movement, creating a direct and ongoing connection between the police-directed retaliation and Plaintiff's increased physical harm. This establishes temporal proximity, motive, and retaliatory escalation tied to protected legal action.

**13. Plaintiff's Displacement**

Penn Medicine documented:

- risk of further deterioration
- inability to safely remain in her home
- involuntary displacement
- escalating symptoms inside the residence

Displacement is evidence of:

- ongoing environmental disturbance
- ongoing interior sensing and surveillance
- ongoing symptom escalation

The same conditions continue today, and the pain intensifies whenever the interior activity is detected. No medical, environmental, investigative, or administrative remedy exists, and the retaliation continues unchecked. Only judicial intervention can protect Plaintiff's rights. This proves continuing harm, continuing surveillance, and continuing constitutional violation.

**Why This Is Unconstitutional**

The Supreme Court has repeatedly held that when the government uses technology to obtain interior information that could not otherwise be obtained without physical entry, it conducts a **Fourth Amendment search requiring a warrant**.

**Kyllo v. United States, 533 U.S. 27 (2001)**

Sense-enhancing technology revealing interior details is a search requiring a warrant.

**Carpenter v. United States, 138 S. Ct. 2206 (2018)**

Advanced surveillance capable of revealing intimate details requires judicial oversight.

**Florida v. Jardines, 569 U.S. 1 (2013)**

Even a trained dog at the threshold constitutes a search because it reveals interior information.

**Taken together, these cases establish a single controlling rule:** When the government uses advanced or sense-enhancing technologies to detect presence, movement, breathing, occupancy, routines, or other interior details of a home **without physical entry and without a warrant**, it conducts an **unconstitutional search**.

The conduct described here — warrantless interior sensing, environmental intrusion, and advanced technological monitoring inside Plaintiff's home — falls squarely within the category of unconstitutional searches the Supreme Court has already prohibited.

The conduct described here — warrantless interior sensing, environmental disturbance, and advanced technological monitoring inside Plaintiff's home — is exactly the type of interior intrusion the Supreme Court has already prohibited. These systems reveal interior details that can only be known by entering the home: where Plaintiff is located, whether she is moving or still, whether she is breathing or sleeping, and what she is doing inside her private residence. Under *Kyllo*, *Carpenter*, and *Jardines*, this level of interior exposure is a Fourth Amendment search that requires a warrant. No warrant exists. The government's use of these technologies inside Plaintiff's home is therefore unconstitutional.

# EXHIBIT 3

# EXHIBIT 3

## Norristown Police Dept. Notice Timeline (2020–2026)

**This timeline documents the points at which the Norristown Police Department ("NPD") had actual and constructive notice of organized narcotics activity in Norristown, including activity consistent with the DTO identified in Plaintiff's September 2024 Drug Report, and the points at which NPD had direct notice of escalating danger to Plaintiff.**

**2020**

**August 18, 2020 — U.S. Department of Justice (EDPA) • Public release: "Norristown Man Charged with Trafficking Cocaine and Heroin in Montgomery County." • Confirms narcotics distribution activity in Norristown. • Provides NPD notice of drug-related activity in residential neighborhoods.**

**2021**

**April 7, 2021 — Philadelphia Inquirer • Public report: "Norristown Police Execute Search Warrant at Suspected Drug House." • Confirms NPD awareness of drug houses in Norristown.**

**December 2, 2021 — U.S. Department of Justice (EDPA) • Public release: "Philadelphia Man and Norristown Associates Charged in Multi-State Cocaine Trafficking Conspiracy." • Confirms multi-state DTO activity involving Norristown participants.**

**2022**

**April 19, 2022 — Montgomery County District Attorney • Public release: "Heroin and Fentanyl Trafficking Network Arrested in Norristown." • Confirms organized narcotics activity in Norristown.**

**September 8, 2022 — Montgomery County District Attorney • Public release: "Norristown Man Arrested in Narcotics Investigation with New York Supply Chain." • Confirms NY → Norristown supply chain consistent with DTO patterns.**

**October 12, 2022 — U.S. Department of Justice (EDPA) • Public release: "Dominican Drug Trafficking Organization Charged with Moving Narcotics from New York to Pennsylvania." • Confirms Dominican-linked DTO activity in the NY–PA corridor.**

**2023**

**May 9, 2023 — Montgomery County District Attorney • Public release: "Two Arrested in Norristown for Heroin and Fentanyl Distribution." • Confirms multi-person narcotics operations in Norristown.**

**July 27, 2023 — Montgomery County District Attorney • Public release: "Large-Scale Narcotics Trafficking Operation with New York Supply Chain Dismantled in Norristown." • Confirms multi-state DTO activity in Norristown.**

**August 3, 2023 — Philadelphia Inquirer • Public report: "Montgomery County Authorities Seize Fentanyl and Cocaine in Norristown Raid." • Confirms residential narcotics activity.**

**October 11, 2023 — NBC10 • Public report: "Two Arrested in Norristown Drug Trafficking Investigation." • Confirms ongoing DTO-linked arrests.**

**2024**

**February 9, 2024 — NBC10 • Public report: "Authorities Break Up Multi-State Drug Ring Operating in Norristown." • Confirms multi-state DTO activity in Norristown.**

**March 21, 2024 — Montgomery County District Attorney • Public release: "Narcotics Investigation Leads to Search Warrant and Arrest at Norristown Residence." • Confirms use of Norristown homes as drug distribution points.**

**June 2, 2024 — 6ABC • Public report: "Police Seize Fentanyl, Cocaine, and Cash in Norristown Home Raid." • Confirms residential narcotics activity.**

**June 6, 2024 — U.S. Drug Enforcement Administration • Public release: "DEA Dismantles Multi-State Drug Trafficking Network Operating in New York, New Jersey, and Pennsylvania." • Confirms Dominican-linked DTO activity across NY–NJ–PA.**

**September 2024 — Plaintiff's Anonymous Drug Report • Plaintiff reports DTO activity at 530 Noble Street, including plate-swapped vehicles and organized distribution patterns. • Plaintiff mandates anonymity. • NPD receives direct notice.**

**September–October 2024 — Plaintiff's Emails to NPD • Plaintiff issues multiple written reports documenting DTO activity and property alignment. • NPD receives repeated direct notice. • No response.**

**2025**

**February–July 2025 — Continued DTO Activity • Plaintiff documents ongoing activity at 530 Noble Street. • NPD receives additional notice through Plaintiff's emails. • No response.**

**July 25, 2025 — Police Report #253248 Filed • Plaintiff files Police Report #253248, documenting DTO activity, trespass, intimidation, plate swapping, and environmental disturbances. • NPD receives direct, formal notice of escalating danger. • No protective action taken.**

**August 13, 2025 — Lt. Dumas Email • NPD states: "In this case, no police action was taken." • Confirms deliberate refusal to act despite multiple prior notices, formal reports, and escalating danger.**

**September 2025–2026 — Emails to Chief Trail • Plaintiff emails Chief Trail repeatedly (exact count to be inserted) seeking assistance and reporting escalating retaliation. • Chief Trail never responds. • Confirms deliberate non-response by a final policymaker.**

**October 5, 2025 — Dead Raccoon Incident • Plaintiff reports incident consistent with retaliation. • NPD refuses to investigate.**

**2026**

**April 28, 2026 — Notice of Intent to Sue NPD • Plaintiff formally serves the Notice of Intent to Sue the Norristown Police Department, documenting retaliation, suppression of complaints, and escalating danger. • NPD receives direct, formal notice from Plaintiff. • No action taken.**

**May 10, 2026 — Police Report #2026-11380 Filed • Plaintiff files Police Report #2026-11380, documenting continued disturbances, intimidation, and retaliatory conduct. • NPD receives additional direct notice. • No investigation or protective action taken.**

**SUMMARY OF NOTICE**

**By 2024–2026, NPD had: • Four years of federal DTO prosecutions involving Norristown or the NY–PA corridor. • Four years of Montgomery County DA narcotics cases involving Norristown residences. • Multiple local news reports documenting drug houses and raids in Norristown. • Direct notice from Plaintiff's anonymous Drug Report. • Direct notice from Plaintiff's repeated emails. • Direct notice from Plaintiff's Police Report #253248 (July 25, 2025). • Direct notice from Plaintiff's Police Report #2026-11380 (May 10, 2026). • Direct notice from Plaintiff's Notice of Intent to Sue NPD (April 28, 2026). • Direct notice of property alignment and visibility into Plaintiff's home. • Direct notice of escalating danger after disclosure of Plaintiff's identity. • Direct notice through repeated unanswered emails to Chief Trail, a final policymaker.**

**This timeline shows continuous, cumulative NPD notice and a deliberate refusal to act, establishing foreseeability, municipal awareness, and escalation of danger beyond that faced by the public.**